UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                            :

CLARA PEREZ,                   :
                            :

               Plaintiff,    :                      **17-CV-4838 (VSB)**
                            :

       - against -        :           <u>**OPINION & ORDER**</u>
                            :

UNITED STATES OF AMERICA,   :
                            :

             Defendant.   :
                            :
--------------------------------------------------------X

<u>Appearances</u>:

David Cvengros
Weiser and Associates, LLP
New York, New York
*Counsel for Plaintiff*

Rachael Doud
Stephen Cha-Kim
United States Attorney's Office for the
Southern District of New York
New York, New York
*Counsel for Defendant*

<u>VERNON S. BRODERICK, United States District Judge</u>:

      This case arises from the collision on August 18, 2014, between a car driven by Special

Agent Brian Sweger of the Drug Enforcement Administration ("DEA") with a car in which

Plaintiff Clara Perez was a passenger. Plaintiff claims that the collision caused her lasting

injuries, including to her neck, back, and left shoulder. On June 28, 2017, Plaintiff filed this

lawsuit against the United States of America pursuant to the Federal Tort Claims Act ("FTCA"),

28 U.S.C. §§ 2671, et seq. (Doc. 1.)

      On April 8, 9, and 11, 2019, I held a bench trial. A total of four witnesses were called

during the trial. Plaintiff called two witnesses during the trial. Perez testified on her own behalf,

and Dr. Joyce Goldenberg, a physiatrist who served as Plaintiff's medical expert and was also one of Plaintiff's treating physicians, also testified. The Defendant called Special Agent Brian Sweger and Dr. Neil Roth, an orthopedic surgeon who served as the expert witness for the United States.[1]

This Opinion & Order constitutes my findings of fact and conclusions of law in this matter pursuant to Rule 52 of the Federal Rules of Civil Procedure. As discussed below, although the evidence establishes negligent operation by Special Agent Sweger of a motor vehicle, the evidence does not support a finding that Plaintiff has been seriously injured and/or that she suffers and will suffer permanent and/or significant physical limitations.

## I.     **Findings of Fact**

1.      Between approximately 6:45 and 7:00 p.m. on August 18, 2014, Special Agent Sweger was driving a 2009 Dodge Avenger, owned by the DEA, that collided into the rear of a Toyota RAV4 in which Plaintiff was a passenger. (JPTO 8; Tr. 201, 206.)[2] At the time of the collision, both vehicles were moving northbound on 10th Avenue in the vicinity of West 36th and 37th Streets in Manhattan. (JPTO 8.) At West 36th and 37th Streets, 10th Avenue is four lanes wide. (Tr. 202.)

2.      Plaintiff contends that Myrta Toro, the driver of the RAV4, stopped for another vehicle in front of her that was signaling to turn right. (Pl.'s FOF 1; Tr. 125.)[3] The light

---

[1] At the conclusion of summations, the Government moved for a missing witness charge concerning Plaintiff's treating physician, Dr. Mark McMahon, and for an adverse inference based on Plaintiff's alleged failure to timely produce certain documents and/or photos from Plaintiff's son's work-related travel overseas and certain media material. Because I find in the Government's favor without considering either of these issues, *see infra*, I need not address these motions and, accordingly, they are denied as moot.

[2] "JPTO" refers to the Stipulations of Facts and Law submitted by the parties as Section VI of their Joint Pretrial Order, which I so ordered on April 1, 2019. (Doc. 50.) "Tr." refers to the transcript of the bench trial.

[3] "Pl.'s FOF" refers to Plaintiff's Proposed Findings of Fact and Conclusions of Law, filed on March 29, 2019. (Doc. 48.)

changed to red before the other vehicle was able to turn and, approximately 3 to 5 seconds after Toro had come to a complete stop, Agent Sweger's car struck the rear of Toro's car. (Pl.'s FOF 1; Tr. 125.) At the time of the collision, Plaintiff estimates that Agent Sweger's car was traveling 70 miles per hour. (Tr. 153–54.)

3.      Defendant contends that, immediately prior to the collision, both Agent Sweger's car and Toro's car were traveling in one of the middle lanes of 10th Avenue in moderate to heavy rush hour traffic. (Def.'s FOF 2; Tr. 202–04.)[4] Defendant maintains that as Agent Sweger approached West 37th Street, Plaintiff's vehicle stopped short without warning and that Agent Sweger, whose vehicle was moving 15 to 20 miles per hour with the flow of traffic, applied his brakes as soon as he saw Plaintiff's vehicle stop short. (Def.'s FOF 2–3; Tr. 202–03.) Agent Sweger testified that he was able to decelerate to a speed of roughly 7 miles per hour when his car hit the rear of the car in which Plaintiff was travelling, making a slight impact. (Tr. 205.)

4.      Immediately following the accident, Plaintiff felt pain in her neck. (*Id.* at 127–28.) Neither Ms. Toro nor Agent Sweger were injured in the accident. (*Id.* at 156, 209.) Shortly after the accident, an ambulance arrived and transported Plaintiff to Bellevue Hospital ("Bellevue"). At Bellevue, Plaintiff stated that she was experiencing pain in her neck but did not identify any other injuries. (*See, e.g.*, Ex. 5 at BH000003, 12.)[5] Plaintiff rated her neck pain upon arrival as a 5 out of 10, meaning "Moderate Pain." (*Id.* at BH00003.) The Bellevue records state that Plaintiff was involved in a "low speed accident" in which the car she was in was "rear-ended by another car." (*Id.* at BH000012.) A computerized tomography ("CT") scan of Plaintiff's cervical spine found "[s]traightening of the upper cervical spine with gentle

---

[4] "Def.'s FOF" refers to Defendant's Proposed Findings of Fact and Conclusions of Law, filed on March 11, 2019. (Doc. 44.)

[5] "Ex." refers to exhibits that were jointly introduced in evidence at trial.

kyphosis centered on C5 likely positional" and no evidence of acute spinal injury.  (*Id.* at BH000007–08.)  An x-ray of Plaintiff's chest was also normal.  (*Id.* at BH000010–11.)  Plaintiff was diagnosed with whiplash, prescribed ibuprofen and a cervical collar, and told to "rest for 1 day."  (*Id.* at BH000013–15.)  Plaintiff was discharged a few hours after arriving at the hospital, at which point she was not in "any form of distress," was "ambulating well," and rated her neck pain as a 3 out of 10, meaning "mild pain."  (*Id.* at BH000014, 16.)  She left the hospital on foot. (*Id.* at BH000018; Tr. 130.)

5.      On August 26, 2014, Plaintiff met with Dr. Joyce Goldenberg, a physiatrist affiliated with Central Park Physical Medicine and Rehabilitation, who has also been retained as Plaintiff's expert witness in this case.  According to Dr. Goldenberg's records, Plaintiff reported tenderness to palpitation and demonstrated a severely limited range of motion in her cervical spine, lumbar spine, and left shoulder.  (Ex. 9 at JG000003–04.)  Dr. Goldenberg diagnosed Plaintiff with cervical sprain/whiplash syndrome, cervical myositis/muscle spasms, possible cervical radiculopathy, lumbar sprain, lumbar myositis/muscle spasms, possible lumbar radiculopathy, and internal derangement of the left shoulder.  (*Id.* at JG000005.)  Dr. Goldenberg prescribed a regimen of physical therapy four times per week with a home exercise program and ordered MRIs of Plaintiff's cervical and lumbar spine and left shoulder.  (*Id.* at JG000006.)

6.      The next day, on August 27, 2014, Plaintiff saw her primary care physician, Dr. Tara Bishop.  (Ex. 7 at WC000038.)  According to Dr. Bishop's records from Weill Cornell Internal Medicine Associates, Plaintiff reported that she had been in a motor vehicle accident and was experiencing neck pain, but that it was improving.  (*Id.* at WC000038.)  Dr. Bishop's notes do not indicate that Plaintiff complained of any pain in her left shoulder or back or that there was any limitation to her range of motion.  (*Id.* at WC000038.)

7.      On September 16, 2014, at Dr. Goldenberg's referral, Plaintiff underwent an MRI of her left shoulder.  Dr. Karl Hussman, who interpreted the MRI, reported a "[h]igh-grade partial tear of the supraspinatus tendon at the musculotendinous junction near the site of acromial contact"; "[s]evere supraspinatus tendinosis centrally and anteriorly at the insertion"; "[a]vulsion of the anterior-inferior labrum"; and "[m]ild capsular laxity."  (Ex. 10 at KH000006.)

8.      Plaintiff saw Dr. Goldenberg again on October 20, 2014 at which time Dr. Goldenberg performed an electromyography[6] and nerve condition study on Plaintiff.  (Ex. 9 at JG000068–72.)  The electromyography study was normal except for "signs of electrical instability along the C5 cervical paraspinal muscles."  (*Id.* at JG000068.)

9.      On October 24, 2014, Plaintiff underwent an MRI of her cervical spine, again at Dr. Goldenberg's referral.  Dr. Hussman, who again interpreted the MRI, reported "[r]eversal of normal cervical curvature with compression fracture of C6, without marrow edema" and "[h]erniations at C4-5 and C5-6 contact the cord at each level."  (Ex. 10 at KH00008.)

10.      On October 24, 2014, Plaintiff also underwent an MRI of her lumbar spine, at Dr. Goldenberg's referral.  Dr. Hussman interpreted the MRI, reporting "[s]hallow broad-based herniation at L5-S1 contacts the sac."  (*Id.* at KH000009.)

11.      On November 4, 2014, Dr. Igor Rubinshteyn performed an orthopedic examination of Plaintiff on behalf of Progressive Casualty Insurance Company.[7]  (Ex. 12 at

---

[6] An "electromyography" is "an electrodiagnostic technique for recording the extracellular activity . . . of skeletal muscles at rest, during contractions, and during electrical stimulation; performed using any of a variety of surface electrodes, needle electrodes, and devices for amplifying, transmitting, and recording the signals."  Dorland's Illustrated Medical Dictionary, at 602 (32d ed. 2012).

[7] At trial, Plaintiff's counsel objected to the report submitted as Joint Exhibit 12 at pages PROG0000236-40, consisting of Dr. Rubinshteyn's report of his examination of Plaintiff on November 4, 2014.  Prior to trial, the parties submitted a list of joint pretrial exhibits and stipulated that the exhibits were authentic under Federal Rule of Evidence 902(11) and that the exhibits constituted business records under Federal Rule of Evidence 803(6).  The parties reserved their rights to object to any hearsay-within-hearsay contained in any of those exhibits at trial.  Plaintiff now contends that Dr. Rubinshteyn's report constitutes hearsay-within-hearsay.  Defendant disputes this view, arguing that the report constitutes only first-level hearsay to which Plaintiff waived any objection.  The parties

PROG000236.)  Dr. Rubinshteyn reported that Plaintiff stated that she was experiencing an "achy, stabbing, pulling, nagging and tingling pain" at a level of eight out of ten.  (*Id.* at PROG000236.)  However, Plaintiff reportedly had "no shooting pain . . . to her legs," could "walk 20 city blocks before experiencing too much pain," had "no difficulty with stairs," and could "sit for 2 hours before experiencing too much pain."  (*Id.* at PROG000236.)  Dr. Rubinshteyn's examination of Plaintiff's cervical, thoracic, and lumbar spines revealed no muscle spasms and normal sensory responses.  (*Id.* at PROG000236–37.)  While Plaintiff displayed some limitations in the range of motion of her spine and left shoulder, Dr. Rubinshteyn noted that "[t]here was evidence of symptom magnification with suboptimal effort, tenderness to superficial touch and over-reaction."  (*Id.* at PROG000239.)  Dr. Rubinshteyn diagnosed Plaintiff with cervical spine sprain, thoracic spine sprain, lumbar spine sprain, and left shoulder sprain, all of which were resolved.  (*Id.* at PROG000239.)  Dr. Rubinshteyn concluded that Plaintiff's "subjective complaints were not correlated by objective findings" during the examination, and that "[n]o ongoing physical therapy or orthopedic treatment would be reasonable or medically necessary."  (*Id.* at PROG000239.)

12.	On December 9, 2014, pursuant to a referral from Dr. Goldenberg, Dr. Mark McMahon performed arthroscopic surgery on Plaintiff's left shoulder.  (Ex. 6 at MM00005–06.) Dr. McMahon's operative report states that the surgery was intended to fix a "partial intraarticular tear of the supraspinatus with labral tear."  (*Id.* at MM00005.)  Dr. McMahon utilized two arthroscopic portals, and described the procedure as follows:  "Using the arthroscopic shaver and TurboVac90, the labrum was debrided back to a stable rim.  Using

do not dispute that, even if Dr. Rubinshteyn's report were not admissible in its own right, Dr. Roth was entitled to testify regarding the findings in Dr. Rubinshteyn's report on which Dr. Roth relied in forming his opinions in this case.  Because I do not rely upon Dr. Rubinshteyn's report in concluding that Plaintiff cannot prevail in this action, I need not analyze Plaintiff's objection, and it is denied as moot.

arthroscopic shaver and TurboVac90, the subscapularis and supraspinatus tendons were debrided back to stable tissue. Using the arthroscopic shaver and TurboVac90, the inflamed synovial tissue was gently debrided. The glenohumeral joint was then irrigated with saline. The portals were closed with 4-0 nylon following injection of 0.25% Marcaine, followed by application of a sterile dressing." (*Id.* at MM000005-06.) The procedure lasted fifteen minutes. (Ex. 11 at MEE000026.)

13. On February 11, 2015, Plaintiff had another appointment with Dr. Bishop. (Ex. 7 at WC000044–47.) Dr. Bishop's records indicate that Plaintiff "[h]ad a shoulder MRI after injury in car accident" and "[i]ncidental findings showed cervical disc herniation," and that Plaintiff "[h]ad a spine MRI that also showed disc herniation." (*Id.* at WC000044.) Dr. Bishop reported that Plaintiff was "completely asymptomatic. No back pain, no neurologic sx." (*Id.* at WC000044.) Dr. Bishop also reported that Plaintiff's motor exam, strength exam, sensation exam, and reflexes were all normal. (*Id.* at WC000046.)

14. On April 6, 2015, Dr. Joshua Auerbach, an orthopedic surgeon, examined Plaintiff at Dr. Goldenberg's referral. Dr. Auerbach reported that, according to Plaintiff, she had "pain in the back and in the neck but it does not radiate down the arms, does not radiate down the legs." (Ex. 8 at JA000004.) After examining Plaintiff, Dr. Auerbach did not recommend surgery. (*Id.* ("I do not recommend any surgery at the moment. I recommend continued nonoperative measures under the direction of Dr. Goldenberg.").)

15. In total, Plaintiff participated in approximately eighteen physical therapy sessions at Dr. Goldenberg's practice between August 2014 and September 2015. (Tr. 133–43.)

16. In September 2015, Plaintiff discontinued medical treatment related to her purported injuries arising from the motor vehicle accident. (*Id.* at 101.)

17. On February 3, 2016, Plaintiff had a regular check-up with Dr. Bishop. (Ex. 7 at WC000049.) Plaintiff did not report any pain in her shoulder, neck, or back, and her physical examination was normal. (*Id.* at WC000049, 51–52.) In addition, Plaintiff did not report any physical limitations.

18. On June 5, 2018, in anticipation of serving as an expert in this litigation, Dr. Roth examined Plaintiff. (Tr. 243.)

19. On September 14, 2018, in anticipation of serving as an expert in this litigation, Dr. Goldenberg examined Plaintiff. (*Id.* at 104.)

20. The central factual dispute in this case is the extent of Plaintiff's injuries resulting from the August 18, 2014 car accident. Plaintiff's primary contention is that she suffered permanent and/or significant limitation of the use of her cervical spine, lumbar spine, and left shoulder as a result of the accident, including bilateral C5 cervical radiculitis, bilateral L5 radiculopathy, and a high-grade partial tear of the supraspinatus tendon of her left shoulder. (Pl.'s FOF 14, 16.) Based on the record presented at trial, including the testimony of Dr. Goldenberg, Dr. Roth, Plaintiff, and Special Agent Sweger, and my review of Plaintiff's medical records, I find that Plaintiff did not suffer serious injury to her back, neck, or left shoulder. At most, the record supports a finding that as a result of the accident Plaintiff suffered a cervical spine strain or lumbar spine strain that have completely healed.

### A. *Weighing the Medical Testimony*

21. Dr. Goldenberg and Dr. Roth offered contradictory testimony regarding the nature and severity of the injuries Plaintiff sustained as a result of the accident. Dr. Goldenberg testified that Plaintiff "sustained injuries to her cervical spine, disc herniations, cervical radiculitis [irritation of the nerve root], muscle spasms, that she sustained lumbar spine

herniation, lumbar radiculopathy [impingement of a nerve], lumbar muscular spasms. That she

sustained internal derangement of the left shoulder, specifically tears of the supraspinatus and

labral tears" and that these injuries are permanent and will cause Plaintiff pain and restriction of

motion for the remainder of her life. (Tr. 69–70; *see also id.* at 56–57.) Dr. Roth testified that

"at most [Plaintiff] sustained a cervical neck strain and a lumbar back strain [and] that she did

not injure her left shoulder" as a result of the accident. (*Id.* at 241.) Dr. Roth further testified

that, at the time of his examination of Plaintiff, those injuries had all been resolved and that

Plaintiff "has no physical limitations as a result of the accident." (*Id.* at 242.) I give greater

weight to Dr. Roth's testimony for the following reasons:

a. First, Dr. Roth's specialty is more narrowly relevant to the inquiry in

question. Dr. Roth is an orthopedist, with board certifications in

orthopedic surgery and orthopedic sports medicine. (Tr. 231, 233.) His

practice primarily focuses on necks, knees, and shoulders. (*Id.* at 236.)

Dr. Goldenberg, by contrast, is a physiatrist, who is board certified in the

field of physical medicine and rehabilitation. (*Id.* at 8.) She testified that

she "refer[s] to orthopedic surgeons for their opinion on surgical

intervention." (*Id.* at 9.) While Dr. Goldenberg certainly appears

qualified to review diagnostic imaging studies such as x-rays, MRIs, and

CT scans, she is not a specialist in the field of surgical procedures

involving the musculoskeletal system. (*Id.* at 8–9.)

b. Second, Dr. Roth conducted a more thorough review and analysis in

reaching his opinions. For instance, Dr. Roth performed both active and

passive range of motion ("ROM") tests during his examination of

Plaintiff, the results of which he found to be normal. (*Id.* at 248–49.)[8] Dr. Goldenberg performed only active ROM tests. (*Id.* at 77.) Because Dr. Goldenberg performed only active ROM tests, "it remains unclear to what extent her results reflect objective medical findings rather than [P]laintiff's subjective complaints," *Ruffin v. Rana*, No. 11 CV. 5406(MHD), 2013 WL 4834368, at *12 (S.D.N.Y. Sept. 4, 2013); *see also Jones v. United States*, 408 F. Supp. 2d 107, 121–22 (E.D.N.Y. 2006) (finding expert testimony unpersuasive in part because much of expert physician's findings regarding plaintiff's range of motion were based on subjective tests, in which the plaintiff had some or total control over his range of motion); *Hodder v. United States*, 328 F. Supp. 2d 335, 355 (E.D.N.Y. 2004) ("[C]ourts have required that the physician conduct objective range of motion tests, and quantify the results of the range of motion tests."); *Gillick v. Knightes*, 719 N.Y.S.2d 335, 336 (2d Dep't 2001) ("We have repeatedly held that a diagnosis of loss of range of motion, because it is dependent on the patient's subjective expressions of pain, is insufficient to support an objective finding of a serious injury."). Moreover, Dr. Roth tested for Waddell's signs while Dr. Goldenberg did not. (Tr. 68, 78–79, 261–62.) Tests for Waddell's signs are used to aid in evaluating whether a patient is malingering or exaggerating her injuries or symptoms. Dr.

---

[8] Active range of motion tests require the patient to move the injured area without external assistance; the patient is asked to move the body part on her own until the point at which discomfort or pain prevents her from going any further. (Tr. 15.) In a passive range of motion test, the physician moves the injured area until the point at which the physician discerns the patient is in too much pain to go any further. (*Id.*) In other words, active range of motion tests are based on a patient's subjective complaints of pain, whereas passive range of motion tests are based on a physician's objective evaluation of the patient's ability to move.

Goldenberg did not test for Waddell's signs because she believed "[t]here was no reason for me to do it. I found [Plaintiff] to be credible." (*Id.* at 115.) Dr. Roth, on the other hand, tested for Waddell's signs in order to evaluate Plaintiff's credibility, and testified that Plaintiff tested positive for Waddell's signs—she exhibited signs of malingering or exaggerating her injuries. (*Id.* at 261–63.)

c.  Third, I find Dr. Roth's testimony regarding the inconsistency of Dr. Goldenberg's conclusions with Plaintiff's relatively normal diagnosis only a few days earlier at Bellevue Hospital to be persuasive. Dr. Roth testified that he did not find Dr. Goldenberg's findings that Plaintiff had a severely restricted ROM, along with pain in her neck, shoulder, and back, to be reliable because those symptoms were not present eight days earlier, immediately after the accident. Dr. Roth further testified that if he were to see a patient exhibiting the same loss of function that Plaintiff supposedly demonstrated during her visit with Dr. Goldenberg on August 26, he would be so concerned at the limited ROM that he would refer that person to the emergency room. (Tr. 288) ("That's such a limited range that if she presented to me in my office like this I would be so concerned that I would probably refer them to the emergency room again because this would be an indication that this is a far significant global loss of function than really I could handle in an outpatient office setting or anybody could to be honest.").)

d.  Fourth, Dr. Roth supported his conclusions by, among other things,

utilizing the MRI imaging of Plaintiff's shoulder. (Tr. 308–55.) Based on Dr. Roth's expertise in orthopedic surgery and experience performing shoulder surgeries, (*id.* at 313–14), I find Dr. Roth's explanation that the imaging showed general degenerative wear and tear rather than a high grade severe partial tear of the supraspinatus at the muscular tendinous junction to be persuasive and credible. Dr. Roth's findings are also consistent with the fact that there is no indication that Dr. McMahon repaired Plaintiff's shoulder during surgery. (*See id*. at 54.)

**B.** ***Weighing the Evidence of Permanent and/or Significant Injury***

22. I discount Plaintiff's assertions that she continues to have debilitating neck, shoulder, and/or back pain because her credibility is diminished by, among other things, the following:

a. Plaintiff's testimony regarding the speed that Agent Sweger's vehicle was traveling at the time of the accident is dubious at best. Plaintiff contends that Agent Sweger's car was traveling 70 miles per hour immediately prior to striking Toro's car, (Tr. 153), while Agent Sweger stated that he was traveling 7 miles per hour when the accident occurred, (*id.* at 205). The evidence—including objective evidence—presented at trial supports Agent Sweger's testimony. First, the accident occurred during rush hour in Manhattan on an avenue where the speed limit is 25 or 30 miles per hour. (*Id.* at 203.) Second, the photographs of the two vehicles depict that the RAV4—the vehicle in which Plaintiff was traveling—sustained only scratches to the cover of the spare tire mounted on the back of the car and

Agent Sweger's vehicle sustained minimal damage to the hood. (Ex. 3 at US000102–04.) Third, Plaintiff was the only party who was injured; neither Agent Sweger nor Toro were harmed in the accident. Fourth, although a New York Police Department Officer reported to the scene, Agent Sweger did not receive a citation for violating any traffic laws, and the police report does not indicate that excessive speed played any role in the accident. (Ex. 4 at US000019.) Fifth, the Bellevue records indicate that Plaintiff was involved in a "low speed accident." (Ex. 5 at BH000012.) These factors all lead me to conclude that Plaintiff's testimony that Agent Sweger's vehicle was traveling 70 miles per hour at the time of the collision is inaccurate, unreliable, and not supported by the objective evidence presented during the trial.

b. The Government introduced two blog posts showing Plaintiff engaging in physical activity with her son. (Gov't Exs. 1, 2.) The photos show, among other things, Plaintiff in a push-up position on the ground supporting her body weight using her arms and shoulders. The blog posts also include an interview with Plaintiff's son in which he states "My mom and I go to the gym often to exercise. I take boxing lessons with her and my grandma . . . and we love to walk everywhere." (Gov't Ex. 2.)[9] These posts are inconsistent with Plaintiff's claims that she sustained serious injuries to her neck, back, and shoulders that prevent her from performing routine tasks such as stirring a pot and combing her hair. (Tr. 145–46.)

---

[9] "Gov't Ex." refers to exhibits introduced in evidence during trial by the Government.

c. Plaintiff testified that she is not prescribed, and does not take, any pain medication for the injuries supposedly sustained as a result of the accident. (*See, e.g.*, Tr. 149.) These statements are inconsistent with Plaintiff's testimony that she is in constant and debilitating pain as a result of the accident. (*See, e.g.*, Tr. 134.)

d. During her testimony, Plaintiff misstated the location of her alleged injury on several occasions. Plaintiff testified twice that she sustained an injury to her right, rather than her left, shoulder. In one instance, Plaintiff testified that "Dr. Goldenberg wasn't seeing enough improvement on the right shoulder, and she suggested that someone else took a look at it and evaluated it." (*Id.* at 139.) Plaintiff did not correct herself until I asked for clarification, at which point she responded, "Oh. Left Shoulder. Sorry. Left shoulder." (*Id.*) Plaintiff went on to describe her examination by Dr. McMahon, saying he "evaluated my right shoulder." (*Id.* at 139–40.) In discussing tasks she is no longer able to complete, Plaintiff stated that, "I can't lift a pot with the right hand. With the left hand. I keep saying 'right,' I'm sorry." (Tr. 145.) These statements contradict Plaintiff's testimony that she has severe chronic pain in her left shoulder, because if she was in severe pain during her testimony it is unlikely she would have misidentified which shoulder was injured during the accident.

e. Since the accident, Plaintiff has traveled extensively with her son as he works and pursues his acting career and involvement with the United Nations Children's Fund ("UNICEF"). Plaintiff has traveled to the

Dominican Republic, Los Angeles, London, Paris, and Cannes. (*Id*. at 180–81.) During these trips she engaged in sightseeing, including by walking. (*Id*. at 181.) She also walks around New York City with her son to various appointments, although Plaintiff claimed she would prefer to take a car service because it would be "less strain on [her] back" but she cannot afford it.[10] (*Id*. at 183, 192–93.) Besides commenting that walking around New York with her son places some strain on her back, Plaintiff did not indicate that she has difficulty traveling with her son, an activity that normally involves walking, standing, and carrying luggage.

f. Plaintiff suffers from prior injuries that have impacted her ability to perform various tasks in her daily life, including driving, cooking, sleeping on her right side, and working. (*Id*. at 120, 134–35.) Indeed, according to Dr. Goldenberg, "[Plaintiff] hasn't been working a number of years due to a disability injury to her eye." (*Id*. at 120.) Even if there was sufficient evidence in the record to support Plaintiff's claim of permanent and/or significant injury—and there is not—she has not demonstrated what daily limitations are due to her prior injuries versus those that are allegedly attributable to the car accident at issue in this case. The only evidence that addresses this issue is Plaintiff's own testimony; she has not presented any corroborating medical and/or expert testimony addressing this issue.

---

[10] Although Plaintiff asserts that for several months after the accident walking was "excruciating", she testified that now she experiences pain only after walking a mile or two. (Tr. 133–34.)

23.     Further, in formulating her opinions, Dr. Goldenberg relied heavily on Plaintiff's own subjective reports of pain, including during examinations conducted after this lawsuit had been filed, (*see id.* at 15, 65, 69), and therefore must be viewed carefully because of Plaintiff's inability to accurately report the accident and the extent of her injuries. Therefore, Dr. Goldenberg's opinions must be viewed in this context.

24.     On the other hand, Dr. Roth, whose testimony I find to be credible, concluded from his examination and his observation of Plaintiff, both in and out of his office, and based on subjective and objective tests, that Plaintiff was never and/or is no longer suffering from a traumatic injury and has normal strength and range of motion in her left shoulder, neck, and back. (*See id.* at 247–64.)

25.     Dr. Roth's testimony also best comports with the other available evidence. Specifically, Dr. Roth's conclusions are in line with all of the medical records admitted in evidence in this case with the exception of those prepared by either Dr. Goldenberg or a physician who treated Plaintiff at Dr. Goldenberg's referral. In other words, all of the medical records relating to Plaintiff's treatment following the accident that were not prepared with the expectation of litigation—including the Bellevue records, Dr. Bishop's records from Plaintiff's numerous visits following the accident, and even the records of Dr. Auerbach who examined Plaintiff at Dr. Goldenberg's request—align with Dr. Roth's conclusions.

26.     Plaintiff's claim of permanent injury is also undermined by the fact that she ceased seeking treatment for her injuries in September 2015. *See, e.g.*, *Watson-Tobah v. Royal Moving & Storage, Inc.*, No. 13-cv-7483 (KBF), 2014 WL 6865713, at *18 n.21 (S.D.N.Y. Dec. 5, 2014) ("While a cessation of treatment is not dispositive—the law surely does not require a record of needless treatment in order to survive summary judgment—a plaintiff who terminates

therapeutic measures following the accident, while claiming 'serious injury,' must offer some reasonable explanation for having done so." (quoting *Pommells v. Perez*, 4 N.Y.3d 566, 574 (N.Y. 2005))).  Here, Plaintiff claims that she ceased physical therapy because she could not afford the treatments.  (Tr. 147.)  However, she did not offer any evidence besides her testimony to support this claim.

## II.  **Conclusions of Law**

1.      Under the FTCA, the United States is liable for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b).

2.      "Under the FTCA, courts are bound to apply the law of the state . . . where the accident occurred."  *Makarova v. United States*, 201 F.3d 110, 114 (2d Cir. 2000).  Accordingly, New York law governs here because the motor vehicle accident occurred in New York.

3.      Under New York law, "a plaintiff must establish three elements to prevail on a negligence claim:  (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof."  *Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 177 (2d Cir. 2013).  Defendant does not dispute the existence of each of these elements, including that some injury occurred as a result of the accident.  The only question before me is the extent of Plaintiff's injury and what compensation, if any, she might be entitled to if she has proven the necessary injury.

4.      Under New York law, the burden is on the plaintiff to prove, by a preponderance of the evidence, that she is entitled to a damages award.  *See Craig Test Boring Co. v. Saudi*

*Arabian Airlines Corp.*, 138 F. Supp. 2d 553, 560 (S.D.N.Y. 2001).  Under New York's "no-fault insurance" scheme, a plaintiff may not bring suit for non-economic loss arising from the negligent operation of a motor vehicle unless she shows a "serious injury."  *See, e.g.*, *Satterfield v. Maldonado*, No. 14 Civ. 0627(JCF), 2015 WL 5098103, at *10 (S.D.N.Y. Aug. 31, 2015) (citing N.Y. Ins. Law §§ 5102, 5104); *see also Licari v. Elliott*, 57 N.Y.2d 230, 234–35 (N.Y. 1982).  Furthermore, a plaintiff may only bring suit for economic loss—including medical costs, lost wages, and reasonable and necessary expenses—in excess of "basic economic loss," i.e., $50,000.  *See id.*; N.Y. Ins. Law §§ 5102, 5104.

5.      This law applies to FTCA actions brought against the United States where the relevant parties are considered "covered persons" under the "no-fault insurance" scheme.  *See Patrello v. United States*, 757 F. Supp. 216, 218 (S.D.N.Y. 1991).  As an occupant of an insured vehicle in New York, Plaintiff qualifies as a "covered person" under the New York "no-fault insurance" scheme.  *See* N.Y. Ins. Law § 5102(j).  The United States is also a "covered person" as defined by New York Insurance Law § 5102(j).  *See Patrello*, 757 F. Supp. at 220.

6.      A "serious injury" is defined as:

[A] personal injury which results in death; dismemberment; significant disfigurement; a fracture; loss of a fetus; permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system; or a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment.

N.Y. Ins. Law. § 5102(d).  There is no dispute that Plaintiff has not established death, dismemberment, significant disfigurement, fracture, loss of a fetus, permanent loss of use of a body organ, member, function or system, or a medically determined injury or impairment which

satisfies the so-called "90/180" standard.  (JPTO 9.)  Thus, the sole issue in dispute is whether Plaintiff has proven by a preponderance of the evidence that she has a "permanent consequential limitation of use of a body organ or member" or a "significant limitation of use of a body function or system."  (*Id.*; *see also* N.Y. Ins. Law § 5102(d).)

7.     A plaintiff may not rely exclusively on subjective complaints as evidence of a "serious injury," and must offer some form of objective proof of a physiological injury.  *Ruffin*, 2013 WL 4834368, at *7 (citing *Toure v. Avis Rent A Car Sys. Inc*., 98 N.Y.2d 345, 350 (2002)).  Objective and credible medical evidence may include, among other things, radiology studies including MRIs, range of motion testing, physician observations of muscle spasm and trigger points, and straight leg testing.  *See, e.g*., *Rivera v. United States*, No. 10 Civ. 5767(MHD), 2012 WL 3132667, at *11 (S.D.N.Y. 2012); *Reyes v. Se Park*, 127 A.D.3d 459, 460 (1st Dep't 2015); *Brown v. Achy*, 9 A.D.3d 30, 32–33 (1st Dep't 2004).

8.     To show a "permanent consequential limitation of use of a body organ or member, a plaintiff must present evidence that she has suffered a permanent limitation that, though not total, is of sufficient severity to be deemed consequential in comparison to her prior non-injured condition."  *See Ruffin*, 2013 WL 4834368, at *12 (internal quotation marks omitted).  To show that the claimed limitation is "consequential," a plaintiff must demonstrate that it is important or significant.  *Vega v. Gomez*, No. 11 CC 212(VB), 2012 WL 4069301, at *7 (S.D.N.Y. July 27, 2012).  A plaintiff must "produce competent medical evidence that [her] injuries are permanent." *Satterfield*, 127 F. Supp. 3d at 191.  Although "permanent pain, even of an intermittent character, may form the basis of a serious injury, plaintiff must provide objective medical evidence of the permanence of her pain and must show that the pain is of sufficient severity that it causes her some form of physical limitation."  *Ruffin*, 2013 WL 4834368, at *13

(internal quotation marks omitted).

9.      As outlined above, the objective evidence in this matter does not support a finding that Plaintiff has any permanent consequential limitations of the use of any body organ or member attributable to the car accident at issue.  To the extent Plaintiff has any current limitations attributable to the car accident at issue, they are minor, not "consequential," and there is insufficient credible objective evidence to support a finding that those limitations are permanent.

10.     To qualify as a "significant limitation," the injury must be significant in both degree and duration.  *Ruffin*, 2013 WL 4834368, at *13.  A "minor, mild or slight limitation of use" of a body function or system does not constitute a "significant limitation."  *Licari v. Elliott*, 57 N.Y.2d 230, 236 (N.Y. 1982).  "The significance of the limitation must be supported by credible medical evidence and must be objectively measured and quantified."  *Ventra v. United States*, 121 F. Supp. 2d 326, 333–34 (S.D.N.Y. 2000).  "Subjective complaints of pain are insufficient to establish a significant limitation, unless accompanied by objective, medical evidence of the extent or degree of the limitation and its duration."  *Ruffin*, 2013 WL 4834368, at *14 (internal quotation marks omitted).  While range of motion testing can provide evidence of a significant limitation, because range of motion diagnoses are often based on tests in which the patient has control over her movements, it is important for the plaintiff to provide objective evidence of constricted mobility, including information about the type of tests conducted and how limitations were measured.  *See Satterfield*, 127 F. Supp. 3d at 194; *Watson-Tobah v. Royal Moving & Storage, Inc.*, No. 13-CV-7483 (KBF), 2014 WL 6865713, at *18 (S.D.N.Y. Dec. 5, 2014).

11.     As discussed above, Plaintiff has not established through objective medical

evidence that she has a significant limitation of the use of a body function or system.

12. Accordingly, given the lack of objective medical evidence of serious injury attributable to the August 18, 2014 motor vehicle accident, Plaintiff has failed to adduce evidence in support of her claim for pain and suffering damages in the amount of $320,000. *See Curry v. Hudson Valley Hosp. Ctr.*, 104 A.D.3d 898, 900 (2d Dep't 2013) (requiring "facts and circumstances" constituting "proof that the injured party experienced" pain and suffering). Additionally, Plaintiff has not shown that she has suffered more than "basic economic loss," defined as $50,000, in the form of medical costs and other expenses, as she must do to recover any economic damages. *See* N.Y. Ins. Law §§ 5102, 5104. Indeed, Plaintiff concedes she seeks only $30,000 in incurred medical expenses. (Pl.'s FOF 17.) Accordingly, Plaintiff has not satisfied her burden of establishing that she is entitled to any damages.

### III.  Conclusion

For the foregoing reasons, judgment shall be entered in favor of the United States. The Clerk of Court is respectfully directed to close the open gavel at Dkt. No. 54 and close the case.

SO ORDERED.

Dated: June 2, 2019
      New York, New York

Vernon S. Broderick
United States District Judge